Argued and submitted January 11, reversed, referee's order reinstated June 5, 1985

In the Matter of the Compensation of
Willi A. Arndt, Claimant.

ARNDT,
*Petitioner,*

*v.*

NATIONAL APPLIANCE CO.,
*Respondent.*

(81-08483; CA A32266)

701 P2d 474

Joseph C. Post, Forest Grove, argued the cause and filed the brief for petitioner.

Marshall C. Cheney, Portland, argued the cause for respondent. With him on the brief was Cheney & Kelley, P.C., Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Claimant seeks review of a Workers' Compensation Board order reducing the referee's award of permanent total disability to 75 percent unscheduled back and psychiatric disability. On *de novo* review, we conclude that claimant meets the statutory criteria for permanent total disability; therefore, we reverse the Board and reinstate the referee's order.

Claimant was employed as a sheet metal worker and welder for employer for 21 years. He suffered a compensable low-back injury in 1975 while lifting 120 pounds. As a result, he underwent surgery for the removal of a "huge" herniated disc at L5-S1 and lamina at L5. Although he returned to work seven months later, he continued to have back pain. A determination order that was not appealed awarded 5 percent unscheduled disability. He began to experience right leg pain in 1976 with numbness in his right foot, together with low-back pain. A second laminectomy was performed in September, 1976, by Dr. Raaf, a neurosurgeon, for the removal of an inferior-articular facet and lamina from L5 right; in addition, Dr. Gripekoven, an orthopedic surgeon, performed a fusion of L5-S1. Claimant returned to work within six months, but soon began to experience back pain. By a determination order of February 2, 1978, he was awarded an additional 15 percent unscheduled disability.

In June, 1979, claimant was compensably injured a second time while lifting a 200 pound compressor.[1] His back pain increased, and he again noticed numbness in his right leg and little toe. For a short time, he experienced pain in his left leg. He was hospitalized for treatment and a myelogram. In a letter to the insurer dated July 19, 1979, Dr. Gripekoven stated:

> "* * * He has had recurrent problems which have become increasingly disabling. There has been no specific reinjury of his back; however, the physical demands of his work are constantly aggravated *[sic]* his preexisting condition.
>
> "I feel that his condition has deteriorated and that his symptoms are now at a level where it is unrealistic for him to

---

[1] A hearing was held in which it was determined that the 1979 incident constituted a new injury, rather than an aggravation, which placed responsibility on employer's carrier at that time.

continue with his present occupation. Unfortunately, the only specific treatment we can offer is symptomatic with appropriate protection of the back and medication. * * *"

An x-ray performed on August 5, 1979, showed "post-operative changes." On December 4, 1979, Dr. Shipps, a roentgentologist, noted that an x-ray of claimant's back showed degenerative changes in the cervical spine. On December 10, 1979, a myelogram was performed, showing post-surgical changes and degenerative cervical disc disease. Dr. Raaf's report, dated December 12, 1979, states that a comparison of a myelogram performed before the 1976 surgery with the myelogram of December 10, 1979, showed "no essential difference in the configuration of the pantopaque column * * *." The report concluded that "it does not seem reasonable to me that any further operative procedure on the patient's lumbar spine would be of any value." The report further notes:

"Following the pantopaque myelogram on December 10, 1979, the patient complained a great deal of low back pain and pain in his neck. I told Mr. Arndt that I did not think that the pain in his neck was connected with the industrial injury of February 18, 1975, or the back strain which he sustained on June 24, 1979. I think the neck pain is due to degenerative disc disease in the cervical spine and is an independent problem."

In a report of September 8, 1981, Orthopaedic Consultants noted a moderate degree of functional disturbance.

Claimant did not return to work after the 1979 injury and has not worked since. He continues to experience pain in his lower back and right leg and numbness in the right foot. Dr. Raaf recommended treatment at Northwest Pain Center; however, the insurance carrier has not authorized such treatment. Orthopaedic Consultants also recommended the Pain Center, but Dr. Colbach, the carrier's consulting psychiatrist, recommended against it, because he thought that claimant would resist it too much.

In a report dated July 19, 1979, following the second injury, Dr. Gripekoven stated that claimant was not able to tolerate the physical demands of welding and should seek "a more protected environment." He also reported that it would be difficult for claimant to find different employment because of his age and limitations as to his ability to use the English language. Dr. Colbach, the carrier's consulting psychiatrist,

found claimant to be of "limited intelligence and very limited education" and concluded that claimant was totally disabled unless he were to receive "some sort of retraining."

At the time of the hearing, claimant was 54 years old. He was born in Poland, lived for a short time in Germany and immigrated to the United States in 1956. He has difficulty speaking and reading English and is unable to write English. He has had a total of six years of education in Poland and Germany and no additional education in the United States. His work experience includes welding, construction, railroad work, papermill work, dog training and janitor work. He testified that after his 1975 injury he could engage in all of his accustomed activities. Since his 1979 injury, however, he sleeps poorly, only two to three hours at a time, and his activities are very limited. He finds it difficult to do even light work, such as feeding his pigeons and rabbits. He now claims to be permanently and totally disabled. A determination order of November, 1981, awarded 35 percent unscheduled disability as a result of the 1979 injury. After hearing, the referee found that claimant was permanently and totally disabled.

The Board reversed the finding of permanent total disability. It expressed difficulty understanding how claimant's 1979 injury could have had such a devastating impact on his physical condition, considering his recovery and return to work after the "more serious" 1975 injury. It is apparent, however, that the Board recognized the seriousness of his present physical disability; it awarded 75 percent unscheduled disability resulting from the 1979 injury.

■ The Board correctly stated that claimant suffers from several physical conditions that are not properly part of the disability calculation, if only the disability resulting from the 1979 injury is in issue. Those conditions include claimant's liver, gallbladder and intestinal problems, which apparently are nondisabling, and the degenerative cervical disc disease. Only the last condition, however, did not manifest itself until after the 1979 injury, and, therefore, could not be taken into account in this proceeding. The Board focused on claimant's neck pain, and then stated:

"We infer that the majority (but not all) of claimant's limitations and difficulties are probably due to his 1975 and/or 1979 industrial injuries. *On the other hand, it is safe to*

*assume that some of claimant's limitations are due to non-compensable conditions, like his cervical disc disease."* (Emphasis supplied.)

Although medical reports indicate that claimant complained of neck pain at one time, it is not apparent from the record that claimant's cervical disc disease was ever disabling, and there is no evidence that it caused disability at the time of hearing. The Board's assumption that some of claimant's limitations are due to the cervical disc disease is, therefore, not supported by the record.

■ ■    In discussing employer's argument that claimant's failure to seek work precludes an award of permanent total disability, the Board discussed the "futility exception":

"As indicated above, we think it is clear that claimant has various forms of physical impairment that were neither caused by his 1979 injury nor are preexisting disability *[sic]* that we can consider under ORS 656.206(1)(a). We are frankly unsure how the futility exception should be applied in this kind of situation; we assume that we should focus only on whether claimant's compensable impairment (i.e., cognizable impairment under ORS 656.206(1)(a)) makes seeking work futile, not whether claimant's total impairment makes seeking work futile. Just before claimant's 1979 injury, his compensable impairment did not prevent him from working at a fairly strenuous job. *We do not think the incremental impairment caused by the 1979 strain-type injury, although difficult to understand on this record, is of a magnitude that would make seeking work futile. * * *"* (Emphasis supplied.)

The Board concluded that ORS 656.206(3)[2] precludes an award of total disability, because it was not futile for claimant to seek work. It is correct that the degenerative cervical disc disease may not be considered under that section; as indicated, however, that condition was not disabling. The other conditions preexisted the 1979 injury and, whether compensable or not, must be considered in determining whether he is permanently and totally disabled and whether it would be futile for him to seek work. ORS 656.206(1)(a); *Livesay v.*

---

[2] ORS 656.206(3) provides:

"The worker has the burden of proving permanent total disability status and must establish that the worker is willing to seek regular gainful employment and that the worker has made reasonable efforts to obtain such employment."

*SAIF,* 55 Or App 390, 637 P2d 1370 (1981); *Butcher v. SAIF,* 45 Or App 313, 608 P2d 575 (1980). The "incremental impairment" caused by the 1979 injury may not have been of a magnitude that would make seeking work futile, but if claimant's total impairment after that injury was such that he could not work, he will not be required to seek work. In such a case, the worker's total impairment might be greater after the second injury than might be estimated by adding the worker's preexisting impairment to the hypothetical "incremental impairment" caused by the second injury. This synergistic effect makes it pointless to speak in terms of "incremental impairment" in a discussion of permanent total disability.

■ Here, the record indicates that claimant's physical and psychological condition is extremely limiting, and there is no evidence that his limitations are the result of anything but the residual effects of the 1975 injury and the 1979 injury. Claimant is unable to sit or stand for long periods of time and must rest after any activity. He is unable to drive and can sit only on one buttock. No doctor has released him for work since the 1979 injury. It is clear from the record that he is not capable of returning to work as a welder or to any other job requiring back strength.

Claimant's limited education, mental capacity and work experience also significantly reduce his employability, as the insurer has implicitly recognized by not offering vocational assistance or pain center treatment, as recommended.

The insurer's consulting psychiatrist confirmed that claimant is totally disabled without retraining. No retraining has been offered, and no one has suggested any kind of work that claimant might be able to perform. We conclude that claimant is permanently and totally disabled. Whether retraining is feasible has not yet been determined. We evaluate the extent of disability as of the time of hearing. *Gettman v. SAIF,* 289 Or 609, 616 P2d 473 (1980).

Reversed; referee's order reinstated.